Mr. Black, you may proceed. May it please the court, counsel. Good morning. I'm here on behalf of the plaintiff this morning. This case, as it boils down, is all about medical clearance. Could I make a short inquiry? Yes. Your name is not on the brief. Correct. Can you explain? I was not trial counsel. I was not retained for the brief. When the oral argument was scheduled in this matter, counsel had a conflict based upon trial. So I was retained for the oral argument. Thank you. Your appearance is in the court file, I assume. Yes, Your Honor. Yes. This case is all about medical clearance in this matter. That's the primary issue. As this case devolved, the medical clearance issue came out. And we have the... I'm a little thrown off by your inquiry there, Your Honor. I'm going to leave it. I don't know why. Well, let me start out with a question. Yes, ma'am. You can then reword. I'm back on the train now, Your Honor. All right. Okay. Go ahead. I've got a lot of questions, so I'll just start. Okay. Why isn't Dr. Snebold's testimony personal practice testimony? And if so, why would that be admissible in this situation and or relevant? I don't believe it is per se personal practice testimony the way that the trial court viewed it. We believe that this testimony is part and parcel of the causative chain in this case. We have testimony here, and if you look at how this case devolved, we have the testimony here of Dr. Joel Kahn, who is the cardiologist. And Dr. Kahn says if the cardiologist had been connected or, excuse me, contacted PRE-OP, then the calcium channel blocker would have been started and the calcium channel blocker in all likelihood would have been or would have stopped or avoided the stroke. Yes. But then how can you, I mean, along those lines, how can you establish that Dr. Riggs violated Dr. Snebold's own personal standard of care? And even if we did standard of care, testimony establishes duty, not causation. Well, I don't, there are other aspects of Dr. Snebold's, or Judy, yes, Dr. Snebold's testimony here, because what he provides here is the first step in the chain. I think it's she. She. All right, so she, you're right. What she provides here is the first step in the chain. She would have provided the jury with testimony that my, had I been contacted, it would have been more likely than not that I would have contacted the cardiologist. When I contacted the cardiologist, according to Dr. Kahn's testimony, the cardiologist would have ordered the calcium channel blocker. Had a calcium channel blocker been ordered, then in all likelihood the stroke could have been prevented. But she wasn't, Snebold wasn't a retained expert. No. She was a treating physician. She was a treating physician. And she did not opine upon whether Riggs violated the standard of care. I agree with that. What we're talking about here, what I'm talking about here, I think, is more lends itself to the causative chain. Because what we've got here, what the jury was not allowed to see is evidence from the medical doctor, the primary care physician, beginning the chain of events. The jury was allowed to hear point B, which leads to point C. The jury did not get to hear point A. Point A being Dr. Snebold saying, well, in all likelihood, I would have referred her to a cardiologist. And then you get to hear Dr. Kahn, the cardiologist. Then you get to hear Dr. Schwartz, the OB-GYN. And then you get to hear Dr. Sinkhorn describing what medical clearance is all about. Go ahead. The point A point is not what an individual doctor would do. It's what an individual doctor would opine is the standard of care or standard of protocol or the proper procedure, generally speaking. And so I was just on a case, I think, just as Shostak wrote it, not Jorgensen, that it is improper to allow, and it's going up to the Supreme Court, too, that personal proclivities are not admissible to establish what the standard of care is or the duty based upon the standard of care. So if Dr. Snebold is testifying that this is what she would have done without the addendum that what she would have done was the standard of care, generally speaking, it's not admissible. And if it's not admissible, then it really shouldn't be point A. It means either you start at point B and either you prove your elements from point B to the end, or else you have failed to present a primary patient case. Your Honor, respectfully, what the plaintiff's... Always. Always, Your Honor. What the plaintiff's proofs here, what the plaintiff was trying to show as part of his case, being the administrator here, was the linkage between the primary care physician through to the stroke. And that linkage would involve the primary care physician's practices and activities. To get to the point where the primary care physician would have in all likelihood brought in the cardiologist. The cardiologist, according to Dr. Kahn, would have ordered the calcium channel blocker. The calcium channel blocker, according to Dr. Kahn and others, would have in all likelihood prevented the stroke. It's a domino effect. What you're presenting is a counterfactual condition, Your Honor. I think what I'm presenting, Your Honor... It's counterfactual because what you just related didn't happen. So therefore, it's a syllogism based upon a fact, not an evidence. Or a fact not in existence. If this were a size day, I'd run you through. Well, it's not a size day, so I'm not going to run you through. So it's not an assault. Right. Okay, well, if she didn't confer with a cardiologist, then that's a counterfactual statement. It didn't happen. So as a statement or syllogism as to causation, it is false or incorrect. Because it is based upon a fact that doesn't exist. My recollection is, Your Honor, okay, I know that we also had the testimony here. Some disputed facts. Whether or not Dr. Riggs telephoned Dr. Stiebold. There was no documentation in Stiebold's record. That is correct. And she testified that her practice would have been to make a note. Absolutely correct. Absolutely correct. It goes to the other point that she would have been allowed to impeach Riggs with her deposition testimony and then call Dr. Stiebold to impeach her. Correct. Which was another point that was advanced at trial for the introduction of this testimony on the credibility of Dr. Riggs. Let's turn to another point. One of the other issues here has to do with Dr. Kahn and Dr. Kahn being disclosed as a 213F witness, an expert witness. Dr. Kahn was disclosed as an expert cardiologist. Correct. And it was disclosed that he would testify how a well-qualified cardiologist would provide a medical clearance for Maria. Why? What is any authority that you have for the argument that these Rule 213 requirements can be relaxed, where indeed in his deposition he said he wouldn't offer the standard of care as to Dr. Riggs. Why should the trial court have allowed his testimony as to a well-qualified physician as opposed to a cardiologist? Correct. He was asked his opinion about a well-qualified physician. Physician. And in that respect, his opinion as a well-qualified physician was not dependent upon his separate qualifications or licensure as a cardiologist. It was not dependent upon the separate qualifications and licensure of Dr. Riggs as an OB-GYN. It was, as it was presented, it was based upon their general knowledge as physicians. But he was disclosed as a 213 witness for standard of care for a cardiologist. Correct. Obviously, you know, Riggs was a gynecological surgeon. Correct. So how did the trial court abuse its discretion? In that the way the trial proceeded, this questioning became an issue that was not… Foreseen. Foreseen, number one. And the way that the trial came about in terms of the difference between the shared responsibility aspect before trial, that now became Dr. Riggs talking about, he alone cleared Maria for surgery, and that this, the different types of certification were not as relevant or prevalent when we were talking about the, what is reasonably, what a reasonably, what a reasonable physician, would we require of a reasonable physician. Okay, but reasonable physician, Riggs was a surgeon. Correct. Gynecological surgeon. Mm-hmm. So how is a cardiologist supposed to opine upon what a reasonable surgeon would do? I don't believe he was being asked to opine about a reasonable surgeon. Well, with regard to standard of care, was he not? With regard to standard of care. I think the question was about a reasonable physician and not a reasonable surgeon. Essentially, a cardiologist consult would have been required. Isn't that really what the base claims that a cardiologist should have reviewed the patient and looked at the history? That's the genesis of everything. Right. In terms of what's going on with the medical clearance. Yes. I don't, have I, can I answer your question? Kind of. Go ahead and make whatever other points you want. I think I've asked a number of the questions that I have. One of the points that you raise is that Eisenstein, Dr. Eisenstein, was permitted to testify about the standard of care required by a physician doing a pre-op and that it does not require an evaluation by a cardiologist prior to undergoing surgery, yet Dr. Sneebold could not offer contrary testimony. Correct. We did raise that point. We raised that in two different respects, one of which had to do with the motion for substitution. We did point out several respects here where, for instance, defendants were allowed to recross without, recross Dr. Kahn without any sort of preliminary matters, but then they'll leave the court. Pardon me? They'll leave the court. They'll leave the court, but then that same thing was not allowed as to Dr. Eisenstein. I'm sorry. Your question didn't dispel that. I'm just kidding. Address that point. That was absolutely one of the issues we have raised in terms of that the plaintiff was not allowed to put on his entire case. There are several instances here showing the abuse of the trial court's discretion that did not allow for a fair trial. We've also raised the issue with Dr. Chekhovich. Again, this goes to the medical clearance issue, that during his deposition, he testified that, to his knowledge or in his knowledge, the patient, Rhea, was not medically cleared for surgery by a physician. But he didn't mention that in his direct testimony, correct? He did not. Yes. So why should he have been able to testify with respect to that? The plaintiff cited Leonardo v. Loyola that talked about whether cross-examination should be allowed to explain, qualify, discredit testimony on direct, even if it's not raised on direct. And I guess the point, ultimately, that we're looking at. You wanted to, the defense wanted, or the plaintiff wanted to cross-examine Chekhovich to show that, based upon his deposition testimony, an inference could be drawn that the patient should have been medically cleared. Correct. Because his answer to apparently the deposition was that, to quote, to his knowledge, Maria had not been medically cleared by a physician prior to surgery. Yes. And the inference being that she should have. Correct. I'd like to clarify. Yes, Your Honor. Justice Berkoth said physician. Are we talking about a physician? Are we talking about a cardiologist? In terms of Dr. Chekhovich's? What you just, too, the two of you were just talking about. Right. Ended up with a statement about a physician. And I want to know whether or not we're talking about a physician slash cardiologist or just a cardiologist or just a physician. My recollection is that the question itself dealt with a physician. He was an expert neurologist, Chekhovich. Yes. Right. And was supposed to be testifying regarding causation. Correct? Correct. Is the breach of duty in this case the failure to consult or refer to a cardiologist prior to surgery? Because if it is, does that then mean that a cardiologist is always supposed to be consulted? Or is it based upon certain facts and criteria? Or is a surgeon's certification that the patient is ready for surgery, is that in the industry considered sufficient? I'm going to try and answer that. Well, it's a multiple issue, but I'm trying to get to the point, which is, you know, the Jews had the Ten Commandments. And I'm relating to the protocols listed on the operation wall, which is surgeon okays patient for surgery. Now, is that in front of or behind consultation or reference to a cardiologist? Or is cardiologist in a footnote with an asterisk down at the bottom that says that it only applies on Thursday? If there is supposedly some act or incident of malpractice, it seems to be a bone of contention between the parties as to either you are to consult with a cardiologist in all instances or at least in certain instances. And if you are talking about always, who testified as to always? And if it isn't always, who testified that in this instance it should have been and why? It's not always, Your Honor. I know the testimony here had to do with this specific patient and how she presented and all the different maladies she had, including her diabetes, including all the other things that she had going on, the neck issues, which I'm not recalling the medical term for that, everything that she had going on with her specifically, that her blood pressure, her blood sugars, all of these things that were endemic to her, that is what created the specific duties and standard of care here that these doctors gave their opinions on,  In her deposition, Dr. Stiebold's testimony, and even when she was pressed, was not certain. She still said, and I'm paraphrasing, it would depend, essentially, correct? I think I have it here. This is the last portion of her answer. The patient was at risk. Anybody with comorbidities like she had was at risk. What I would have done at that time, I cannot speak to, except that my standard of care is usually to get medical clearance. I mean a cardiovascular clearance. And that was the end of that one description during the offer. So there was no specific testimony that in this particular instance with these factors, she would have gotten better. I think in terms of Dr. Stiebold and what she talked to and what she alluded to, she did give, I think she was very candid that she was being asked to be a Monday morning quarterback, as it were. And I think that candor as to what she probably would have done, I think that's not a grounds to remove her. I think that should have been a weight and credibility issue for the jury, but not something that should have been. But isn't that the purpose of depositions and disclosure to hear about what the opinion will be? Yes. I think her opinion talked about what she was more likely to do in terms of contacting the cardiologist. I have one more question. Yes, Your Honor. And it's because I don't think you answered my prior question, which is your conversation just now relates to Stiebold and the fact that she was talking about what she might have done. And what I asked you previously was, in the event that we're talking about it depends, which expert testified that in the industry the standard would have been a reference to a cardiologist or a referral to a cardiologist? Which expert made those statements or gave those opinions? In all candor, Your Honor, as I'm standing here, I'm not recalling. And I apologize for my lack of recollection. Okay. Well, maybe you can rewind during rebuttal. Yes, Your Honor. Okay. Thank you. Thank you, Your Honor. Mr. Wine? Do you happen to know the answer to the question I just broached or not? I do. I think I do. So I think your question, Your Honor, was who from the plaintiff's side, which expert said the standard of care required Dr. Riggs to refer this patient to a cardiologist? And was it conditional or unconditional? Well, they said that there were certain facts about Maria that required Dr. Riggs to do it, to be a reasonable physician under the circumstances. Who was that? That came from Dr. Schwartz, their internal medicine slash neurocritical care physician. I also think if you read Dr. Kahn, it came from him too. Although he didn't specifically say it, if you read his testimony, he would ask questions such as what conditions require referral to a cardiologist, such as you were asking, Justice McLaren, is it everyone? And Dr. Kahn said no. But he basically described Maria's conditions would require referral to a cardiologist. So they did have evidence from two experts for sure that said the standard of care under these circumstances required referral to a cardiologist. So I don't want to put words in your mouth or even your esophagus. It's okay, Justice. Or I guess it would be your larynx. But would your argument then be that because there were at least two experts who opined on the plaintiff's side that the trial court did not preclude the plaintiff from presenting evidence on the elements which they claimed they were precluded? Exactly. That gets back to what you were talking about with step A. They had step A. And I think to take a step back, they keep saying that this is relevant for proximate cause. I don't think it is. And I think when you look at the record, they have one reference from Dr. Sinkhorn, who is their OBGYN expert, who says the standard of care required Riggs to get medical clearance from a medical doctor. There's nowhere in the transcripts. I went back and looked for this. There's nowhere in the transcripts where they say the standard of care required Dr. Riggs to refer directly to Dr. Snebold. The discrepancy between Dr. Riggs' deposition testimony and her testimony at trial, which to me, you've got a witness who's flipped on you, essentially. I guess we take the position she didn't flip because I think when you look at the record, she called Snebold, and it turns out there's no documentary evidence of that, and she said she cleared the patient herself. I agree that there's a discrepancy between Dr. Snebold and Dr. Riggs with regard to that preoperative phone call. Dr. Snebold, when she's initially asked, says, I don't remember. She says she didn't document one, but she didn't deny it. Dr. Riggs said, I did call her beforehand. And I think what's important, though, is the context that Dr. Riggs gave to that phone call. Now, this came out through the plaintiff's questioning. This is not something the defense brought up because I don't think the phone call was even an issue. She was not criticized for not calling Dr. Snebold. She was criticized for not arranging preoperative care, postoperative care, I'm sorry, but no one said she had to make a phone call. But Dr. Riggs said the purpose of that phone call was to say, I saw your patient. Thank you for the referral. I would like you to handle her postoperative care, which we know from the records actually occurred because Dr. Snebold at 1 o'clock in the afternoon entered orders for blood pressure medication, and then I think 2.30 in the afternoon, the day of surgery, entered the sliding scale for the insulin in response to blood sugar results on the floor. So I think when you look at the context of the telephone call, asking Dr. Snebold about what her personal practice would be wouldn't really impeach whether that phone call occurred or not because Dr. Riggs was not saying, I'm calling her to say, I want you to clear her, or does she need to see a cardiologist, that wasn't the conversation because at that point Dr. Riggs had done the preoperative evaluation that she felt needed to be done. So I don't think that that personal practice impeaches Dr. Riggs on that point. I think the other point that they claim Dr. Riggs flipped on is whether she cleared the patient or whether she didn't clear the patient. And I submit, her deposition, she was asked almost virtually the same question she was asked at trial. Well, actually she was asked different questions, wasn't she? I mean, so therefore, if she was asked different questions, then there really was no surprise. I mean, if, but if not, then one could say, you know, there was surprise and then wouldn't the plaintiff have been entitled to greater latitude under the Rule 213? I don't think so. I don't know of any authority that says 213 can be relaxed. But I submit, if you read Dr. Riggs' deposition, it's not inconsistent with what she said at trial. What she said at trial was, I made the ultimate decision that this patient was a surgical candidate and could go to surgery. Now, in her deposition, she was asked questions and she also said, well, there were other people that looked at this patient preoperatively, namely the anesthesiologist, namely the preoperative evaluation center at the hospital the day before the surgery. So she's saying, look, there are other people who were involved in this process. Dr. Stiebel looked at knee KG preoperative and wrote on it, okay for surgery. But she's saying, ultimately, as a surgeon, I decided whether or not she could go to surgery. And she said that at trial, too, and I don't think that's inconsistent and I don't think that would open the door then to Dr. Kahn expanding his criticisms to include Dr. Riggs when point blank in his deposition he said he was not going to be offering that opinion and there was no supplementation at any time before the trial. I don't know if that answers and did that answer your question? Yes. You agree that trial courts should afford wide latitude on cost examination. Right. Why should Eisenstein be permitted to testify to the standard of care required for a physician doing a pre-op that it does not require an evaluation by a cardiologist prior to undergoing surgery, yet Dr. Stiebel could not offer contrary testimony on that point? First of all, Dr. Eisenstein was disclosed on that and he was specifically disclosed to counteract Dr. Schwartz's testimony as a preoperative clearer. I think it gets back to Dr. Stiebel. We believe that was personal practice testimony, which is inadmissible. It was not standard of care testimony. I think if Dr. Stiebel had offered a standard of care opinion, it might be different, but I think when you look at what she said, she clearly said this would be my personal practice and I think as you pointed out, she was kind of wavering that she'd have to see the patient anyway to make sure because it depends. So I think that's the difference here. I don't think Dr. Eisenstein testifying opened up any doors. Was there an offer of proof made as to whether or not Stiebel would have testified other than the way she did previously regarding her personal proclivities as opposed to a standard in the industry? No, Your Honor. I do not believe there was any sort of offer of proof outside of what was in her deposition and I think the other thing that's telling is, during the extensive arguments we had on Defendant to Motion and Eliminate No. 45, Judge Meyer asked Mr. Selby a number of times, I think you're offering this on standard of care and Mr. Selby's response at least three or four times was no, it's for causation only. She's only testifying as to causation, not as to what the standard of care of Dr. Riggs or even what the standard of care of a primary care physician doing a preoperative evaluation would be. And I think the other thing you look at is that they disclosed Dr. Schwartz on that. So I think that's why Dr. Eisenstein's testimony did not open the door to questioning Dr. Stiebel or even cross-examining Dr. Eisenstein about her deposition because that was another point that they raised. But Dr. Eisenstein never said Dr. Stiebel would not have referred to a cardiologist. He never said no primary care physician would never refer to a cardiologist and he even acknowledged that it's not against the standard of care to refer to a cardiologist. He said it's just not required under these circumstances. So I don't think that there was any need to impeach Dr. Eisenstein with her death or that his testimony opened up any doors to allow Dr. Stiebel's personal practice testimony. What about the substitution for cause argument? I don't believe they've met their burden, Your Honor. I think it's a high burden. One of the things the trial court said, which is something that lights up counsel whenever a judge says that, where he says, you guys have lost your credibility with me, you've spent your credibility with me. Isn't that an indication that the trial court has lost his ability to be impartial? I don't believe so under these circumstances. I think living through the trial, it was a nine-day trial, as stressful as trials are, I think everyone was getting frustrated. I think the judge was frustrated at that point with some of the things that had been argued and said for whatever reason. But I think one of the points to bring back would be he was saying, I'm frustrated, I think, with your citation to authority that I don't think applies, that they kept trying to fit round pegs into a square hole, essentially. I believe so, and I think that the one point that might be telling on that is we had an argument at the very end of the trial on the rebuttal witness. That was Dr. Joel Meyer. He was a neuroradiologist. He was allowed as a rebuttal witness, and, of course, the plaintiff wanted to bring him in in their case in chief, and Judge Meyer said, no, I allowed him as a rebuttal witness. He can be a rebuttal witness. And there was an issue about whether or not the defense had raised an issue for him to rebut. And I think, you know, Judge Meyer went back and forth, but if you read the transcript, the plaintiff was able to bring cases to him and say, look, Judge, we think you need to allow this. And ultimately, Judge Meyer did. I mean, so I think ultimately it was a fair trial. I think that that comment was more of an expression of frustration. But there were just a very few of those incidents that took place. I mean, if you look at the whole transcript over this nine-day trial, there were just a couple incidents like that, isn't that correct? I believe so, Your Honor. And they cited some rulings that they believe were uneven-handed. I think if you look at the rulings, there were reasons why Judge Meyer ruled the way he did. Maybe people don't agree with it, maybe in hindsight it's not right, but I don't think anything was an abuse of discretion or sort of a demonstration that he was unfair or unable to give the plaintiff a fair trial. I think everyone got to put their theory in and argue their case to the jury. Is there any citation of authority as to whether or not a statement like you've lost credibility is a condition of bias or prejudice? I couldn't find one. There was a case, I believe one of the parties was Antonacci, that I think we cited in our post-trial motion or maybe our brief, where the judge talked about being fed up that an attorney wasn't meeting deadlines or something like that, and then the appellate court said no. Well, prejudice is supposed to come from the concept that you prejudge something. And if you prejudge something and the time of the alleged prejudgment has occurred so late in the trial and you say that you've lost credibility, if that doesn't imply what I think it does, I think it implies that at one time you had credibility. So from that point, at least backwards, the plaintiff had credibility and was doing things that caused the judge to lose belief in the credulity of what is being said. And so I don't know. I could buy the argument that if he says I don't believe you before trial, that's prejudging. But if you say something during the trial that suggests that you claim that an elephant caravan caused you to be late for trial, that, unless there was a circus in town, that might raise some doubt as to credibility. So if over time a statement is made and there are things in the record that would suggest that these people are constantly arguing points which the trial court has previously ruled on without citation of new authority, that this isn't a question of prejudgment. I see your point, Your Honor. And I believe the cases talk about an extrajudicial source can show prejudgment. If you're going to use something within the context of a judicial proceeding, otherwise, ridiculous statements can be made throughout the trial until the very last day, and it's apparently if the judge says, you know, you've been BSing me the whole time, that's supposedly an indication of bias even though you've been BSing the whole time. And I think going back to my other point, that comment was made in an argument, I believe, with regard to the redirect or recross of Dr. Chekovich. The Dr. Meyer issue happened after that, and certainly Judge Meyer ruled in their favor on that when they brought him what he believed to be controlling authority to say, I'm going to allow this witness. Now, I think at one point he said, I'm not going to allow it, and then they brought him new authority and he read it and he said, I'm going to allow it. And it was an isolated comment. I have one other question, really, with regard to the procedure used in this case with respect to the sidebars. Those sidebars took place certainly out of the hearing of the jury, but also outside of the recording sphere of the digital or electronic recording system. Was there any thought given by either the judge or either of the parties to the fact that, one, this case might be appealed and that the appellate court might benefit from greater context with regard to what the sidebar was all about with respect to which witness, which place in the testimony that took place? I assume there was really no discussion about that, because if so, it might have been done a little bit differently or more completely. I can tell you when McHenry County went to the electronic recording system, it became difficult because that was deemed the official court reporter. And Judge Meyer has hearing deficits, so he likes to take people in the back hall to do the arguments rather than take the jury in and out each time. And that's really why there were two transcripts, so to speak. According to the court, we're required to use the electronic recording system when we're in the courtroom, but if we're out in the sidebar, we bring the court reporter back. How did you determine what transcript related to what objection where in the trial, if it doesn't say it in the transcript? That's my point. I'm not sure how they set this up, Your Honor. And that's always been a cumbersome process in that courthouse, that you have these two court reporters and you're doing stuff outside the courtroom and in the courtroom. I don't know the right answer to that. Well, I know in this case it's ultimately the appellant's burden to produce a complete record and one that could be intelligible to the appellate court, but I would respectfully suggest that in the future what Justice McLaren mentioned really be incorporated in those sidebars if that is going to continue to be the practice there. Thank you. And if we ask that the jury verdict be affirmed before us, we'll read it in our brief. Thank you. Thank you. Mr. Black, you heard Mr. Wine's answer of Schwartz and Pye, I believe it was. Do you have any additional experts? I'm sorry? Do you have any other additional experts relative to the question that I asked you that you couldn't recall regarding the standard of care? Your Honor, from what I was able to review, I believe it was Dr. Kahn and Dr. Sinkhorn who did give some discussion to the standard of care testimony. I believe it was also Dr. Kahn and Dr. Sinkhorn, and I can't cite to where in the record that did discuss about aspects of the treating physician also. Well, do you think that Schwartz opined as well, or do you disagree with Mr. Swine's answer? No, I believe Dr. Schwartz did give a general standard of care testimony. I don't know that it was on to the specific points that Your Honor was asking about. Okay. And I also do agree with Your Honors that, boy, that's a messy way of doing that with the sidebars and the transcription for the record purposes. Anyway, kind of working backwards with what you were discussing about the issue with the motion for substitution, I think that it is very concerning when a judge says you've spent your credibility with me. I don't know by that comment if spent your credibility means it's spent now or it's been used up already. I'm not sure. Did the judge make specific reference to case law that was presented? Correct. It was in reference at that point to a disagreement about the discussion interpretation about the Leonardi case. The way that discussion played out and then the judge followed it up with, I'm not going to allow you to do your histrionics about cross-examination, if you read that entire passage, something had been built up. I don't know that it's exactly now I've had enough and now you are, whatever is spent now. I think that's just kind of flawed. It is disturbing that that kind of commentary comes out in a trial court. I know during trial things get heated and things are said, but as I said, it's disturbing. Mr. Wan said that you didn't sustain your burden to establish a substitution. Did you want to comment further on that? Yes, Your Honor. I think that in terms of showing actual prejudice, we did, by those types of comments, by the activity during the trial, did sustain that showing of actual prejudice. Those are very serious comments to make during a trial about you've used up your credibility. I don't know how you go through. We have to look at the context, do we not? Absolutely not. We know it was with regard to some case law and case law that would have been relevant. We also know that this was not at the end of the trial. I know that there were actions and rulings that the trial court made, which would have certainly indicated that maybe that comment, taken in context, had to do with frustration rather than any prejudice or bias that had developed. I don't think we can read it in isolation either. Absolutely, Your Honor. This is not something that just sprang up out of nowhere. This is not just something that came out of a disagreement about one case. This has been building. This is something that obviously the court didn't say. The court doesn't just say that because they're disagreeing about one case. Did Judd Meier provide an affidavit? Pardon me? Did Judd Meier provide an affidavit? It went into the necessary clause. It just went to the chief judge. Went to the chief judge, right. Judd Meier did not provide an affidavit. Not to my recollection. Not to my recollection. Was there an offer of proof relative to Snydvall's possible statement that it was something other than a personal protocol and was a general standard in the industry? My knowledge of the offer of proof is it was contained from the deposition at record 1374 through 1376. I did not find anything else in terms of a record of proof for Dr. Snydvall. And that record of proof goes to, again, her likelihood of how she treats, her discussion of how she treats patients on an individual basis and her likelihood here based upon Maria's particular maladies. I hear my time is up. We do believe that for the reasons stated, that the rulings excluding the evidence here did constitute an abuse of discretion. We would ask that the matter be reversed and sent back for a new trial and that the motion for disqualification also be considered appropriately. Thank you very much.  Are you here under 1 o'clock as well or not? Pardon me? Are you here under 1 o'clock as well? Not I. Thank you.